## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**MICHAEL L. BROWN,**

     **Plaintiff,**

**vs.**                        **Case No.  4:15cv252-MW/CAS**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social**
**Security Administration,**

     **Defendant.**

_____/

## <u>REPORT AND RECOMMENDATION</u>

This is a Social Security case referred to the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Acting Commissioner (Commissioner) of the Social Security Administration (SSA) denying Plaintiff's application for Supplemental Security Income (SSI) pursuant to Title XVI of the Social Security Act (Act).  After consideration of the record, it is recommended that the decision of the Commissioner be affirmed.

## I. Procedural History

On August 15, 2012, Plaintiff, Michael L. Brown, filed an application for SSI alleging disability beginning June 6, 2009, due to back pain, obesity, depression, anxiety, diabetes, hypertension, and breathing problems.  Tr. 12, 70, 81, 96, 162-67, 199, 203.[1]  (Citations to the transcript/administrative record, ECF No. 10, shall be by the symbol "Tr." followed by a page number that appears in the lower right corner.)

Plaintiff's application was denied initially on September 18, 2012, and upon reconsideration on October 24, 2012.  Tr. 12, 70-91, 104-18.  On November 13, 2012, Plaintiff filed a written request for a hearing.  Tr. 12, 119-21.  On September 17, 2013, Plaintiff's counsel asked the Administrative Law Judge (ALJ) to consider requesting a consultative psychological evaluation/examination, in part, because Plaintiff had been evaluated by Dr. George Horvat in 2009, Tr. 291-94; Plaintiff had been evaluated at Apalachee Center "with findings including bipolar disorder (depressed) with anxiety"; and that "[Plaintiff] had complained of depression

---

[1]  During the hearing, Plaintiff, by counsel, amended Plaintiff's alleged onset date to August 15, 2012, the date the current SSI application was filed.  Tr. 12, 35-36.  It appears that on August 25, 2012, the SSA advised Plaintiff that he was not entitled to "disability benefits" because he had "not worked long enough under Social Security."  Tr. 99-100.

for many years."[2]  Tr. 69/283.  On October 31, 2013, Plaintiff appeared and testified at a hearing held in Tallahassee, Florida, by ALJ Jeffrey Marvel. Tr. 12, 37-60.  Robert N. Strader, an impartial vocational expert (VE), testified during the hearing.  Tr. 12, 61-67, 155 (Resume), 278-79 (VE past work comments).  Plaintiff was represented by Brian A. Dusseault, an attorney.  Tr. 12, 32, 34, 92-95.

On December 18, 2013, the ALJ entered a decision and denied Plaintiff's application for benefits concluding that Plaintiff was not disabled since August 15, 2012, the date the application was filed.  Tr. 12-26.

On or about January 28, 2014, Plaintiff's counsel requested review of the ALJ's decision and filed a brief dated January 22, 2014, with a copy of his letter of September 17, 2013.  Tr. 4-5, 7-8, 280-83 (Exhibit B18E).  On March 6, 2015, the Appeals Council considered the reasons Plaintiff disagreed with the ALJ's decision and concluded "that this information does not provide a basis for changing the [ALJ's] decision."  Tr. 1-6.  The Appeals Council denied Plaintiff's request for review of the ALJ's decision making the ALJ's decision the final decision of the Commissioner.  S*ee* 20 C.F.R. § 416.1481.

---

[2]  During the hearing held before the ALJ, there is no mention of Plaintiff's request for a new consultative psychological evaluation/examination, Tr. 69/283.  Tr. 32-68.

On May 7, 2015, Plaintiff, by new counsel, filed a Complaint with the

United States District Court seeking review of the ALJ's decision.  ECF No.

1.  The parties filed memoranda of law, ECF Nos. 18 and 21, which have

been considered.

## II.  Findings of the ALJ

The ALJ made several findings:

1. "The claimant has not engaged in substantial gainful activity since
   August 15, 2012, the application date."  Tr. 14; *see* Tr. 174-80,
   185-87 (earnings summary); Tr. 192-93 (work history report).
   Plaintiff testified he had a job in 1997 for a couple of months.
   Tr. 38.  In 1998, Plaintiff worked for about three months loading
   furniture (some would weigh more than 100 pounds) in and out of
   the truck.  They used dollies.  They had a wreck and when he
   complained of back pain and said he needed to have it checked
   out, he was fired.  Tr. 61-62.  Plaintiff had been incarcerated from
   2001 to 2009 in federal prison.  Tr. 38.  After being released,
   Plaintiff testified that he worked part-time at Connie's Country
   Kitchen as a dishwasher in 2009 for five months.  Tr. 37; 193-94,
   204, 212-14.  Plaintiff explained that he did not have much of a
   work history because he had been a felon since 1990, with
   approximately three years spent in county jail.  Tr. 39.  He applied
   for over 200 jobs, but did not get an interview.  He "probably" could
   have worked if he got a job.  *Id.*

2. "The claimant has the following severe impairments: diabetes
   mellitus; hypertension; degenerative disc disease of the lumbar
   spine; bipolar disorder; and obesity."  *Id.*  The ALJ considered that
   Plaintiff was diagnosed with adjustment disorder with depressed
   mood and pain disorder at a 2009 consultative examination and
   more recently Plaintiff's treating source at the Apalachee Center
   characterized Plaintiff's diagnosis as bipolar disorder, which the
   ALJ added.  Tr. 14-15. The ALJ noted that "[t]he above-specified
   medically determinable impairments have been fully considered
   both singly and in combination with the other impairments, in the

undersigned's assessment of the claimant's residual functional capacity."  Tr. 15.

3. "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  Tr. 15.  The ALJ determined that Plaintiff had *mild* limitations in activities of daily living; *moderate* difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace; and that Plaintiff had *no* episodes of decompensation, which have been of extended duration.  Tr. 15-18.

4. "[T]he claimant has the [RFC] to perform light work as defined in 20 CFR 416.967(b), such that he can occasionally lift 20 pounds and frequently lift 10 pounds.  He can stand and/or walk 6-hours in an 8-hour workday.  He can frequently climb ramps, stairs, balance, and/or kneel.  He can occasionally stoop, crouch, crawl, and climb ladders, ropes, and/or scaffolds.  He should avoid concentrated exposure to extreme heat, hazards, humidity, wetness, and/or vibrations.  He is able to do only simple, routine, repetitive work.   He is limited to frequent contact with the public, co-workers, and/or supervisors.  He can work no more than a regular pace."  Tr. 18.

5. "The claimant has no past relevant work."  Tr. 24; *see* ¶ 1. above.

6. The claimant was born in 1959 and was 52 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed.  *Id*.; *see* 20 C.F.R. § 416.963(d) (age 50-54).  "The claimant has at least a high school education and is able to communicate in English."  R. 24.  Plaintiff testified that it took him 10 to 12 years to get his college degree, accomplished when he was in his 20's and 30's.  Tr. 58-59.

7. "Considering the claimant's age, education, work experience, and [RFC], there are jobs that existed in significant numbers in the national economy that the claimant can perform."  Tr. 25.  The ALJ determined that Plaintiff's ability to perform all or substantially all the requirements of a full range of light work had been impeded by additional limitations.  *Id*.  As a result, the ALJ asked the VE the

extent to which these limitations he wrote of the unskilled light occupational base for Plaintiff.  The VE testified that in light of certain enumerated factors, Tr. 64-65, a hypothetical person, here Plaintiff, could perform several representative occupations such as (1) rental clerk, DOT number 295.367-026, classified as light, unskilled, with an SVP of two; (2) office helper, DOT number 239.567-010, classified as light, unskilled, with an SVP of two; and (3) housekeeper, DOT number 323.687-014, classified as light, unskilled, with an SVP of two.  Tr. 25, 64-66.  The VE testified that his testimony was consistent with the DOT.  Tr. 25, 67. [3]

8.  "The claimant has not been under a disability, as defined in the Social Security Act, since August 15, 2012, the date the application was filed."  Tr. 25.

## III.  Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is

supported by substantial evidence in the record and premised upon correct

legal principles.  42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131

(11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less

---

[3]  "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  20 C.F.R. § 416.968(a).  A Specific Vocational Preparation (SVP) of two means "[a]nything beyond short demonstration up to and including 1 month."  Dictionary of Occupational Titles (DOT) (4th ed., rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP.  "[SVP] is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  Id.  Unskilled work corresponds to an SVP of one and two.  Social Security Ruling (SSR) 00-4p, 2000 SSR LEXIS 8, at *8 (Dec. 4, 2000).  Further, unskilled work is work involving understanding, remembering, and carrying out simple instructions; making simple work-related decision; dealing with changes in a routine work setting; and responding appropriately to supervision, co-workers, and usual work situations.  SSR 85-15, 1985 SSR LEXIS 20, at *10-11 (1985).  In part, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying objects weighing up to 10 pounds."  20 C.F.R. § 416.967(b).

than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).  The court may not reweigh the evidence or substitute its own judgment for that of the ALJ even if it finds that the evidence preponderates against the ALJ's decision. Moore, 405 F.3d at 1211.[4]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age,

---

[4] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 416.909 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212 (2002).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 416.920(a)(4)(i)-(v).

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

   4.  Does the individual have the residual functional capacity (RFC) to perform work despite limitations and are there any impairments which prevent past relevant work?[5]

   5.  Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work.  If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the

---

[5]  An RFC is the most a claimant can still do despite limitations.  20 C.F.R. § 416.945(a)(1).  It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records.  *Id.*  The responsibility for determining claimant's RFC lies with the ALJ.  20 C.F.R. § 416.946(c); *see* Social Security Ruling (SSR) 96-5p, 1996 SSR LEXIS 2, at *12 (July 2, 1996) ("The term "*residual functional capacity assessment*" describes an adjudicator's finding about the ability of an individual to perform work-related activities.  The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence.").

national economy in light of the claimant's RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 416.920(a)(4)(v), (e) & (g).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

As the finder of fact, the ALJ is charged with the duty to evaluate all of the medical opinions of the record resolving conflicts that might appear. 20 C.F.R. § 416.927.  When considering medical opinions, the following factors apply for determining the weight to give to any medical opinion: (1) the frequency of examination and the length, nature, extent of the treatment relationship; (2) the evidence in support of the opinion, such as "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight" that opinion is given; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist and, if it is, it will be accorded greater weight; and (5) other relevant but unspecified factors.  20 C.F.R. § 416.927(b) & (c).

The opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). This is so because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 416.927(c)(2).  "This requires a relationship of both duration and frequency."  Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003).

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated. Phillips, 357 F.3d at 1241.  "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error."  MacGregor, 786 F.2d at 1053.

The ALJ may discount a treating physician's opinion report regarding an inability to work if it is unsupported by objective medical evidence and is

wholly conclusory.  Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir.

1991).  Stated somewhat differently, the ALJ may discount the treating

physician's opinion if good cause exists to do so.  Hillsman v. Bowen, 804

F. 2d 1179, 1181 (11th Cir. 1986).  Good cause may be found when the

opinion is "not bolstered by the evidence," the evidence "supports a

contrary finding," the opinion is "conclusory" or "so brief and conclusory that

it lacks persuasive weight," the opinion is "inconsistent with [the treating

physician's own medical records," the statement "contains no [supporting]

clinical data or information," the opinion "is unsubstantiated by any clinical

or laboratory findings," or the opinion "is not accompanied by objective

medical evidence."  Lewis, 125 F.3d at 1440; Edwards, 937 F.2d at 583

(citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).  Further,

where a treating physician has merely made conclusory statements, the

ALJ may afford them such weight to the extent they are supported by

clinical or laboratory findings and are consistent with other evidence as to a

claimant's impairments.  Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th

Cir. 1986).

Further, when a claimant attempts to establish a disability based on

his subjective complaints, he must provide evidence of an underlying

medical condition in either objective medical evidence confirming the

severity of the alleged symptoms or that the medical condition reasonably could be expected to give rise to the alleged symptoms.  *See* 20 C.F.R. § 416.929(a) and (b); <u>Wilson</u>, 284 F.3d at 1225-26.

Pain is subjectively experienced by the claimant, but that does not mean that only a mental health professional may express an opinion as to the effects of pain.  One begins with the familiar way that subjective complaints of pain are to be evaluated:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

<u>Wilson</u>, 284 F.3d at 1225.  *See* 20 C.F.R §§ 416.929 (explaining how symptoms and pain are evaluated); 416.945(e) (regarding RFC, total limiting effects).  This is guidance for the way the ALJ is to evaluate the claimant's subjective pain testimony because it is the medical model, a template for a treating physician's evaluation of the patient's experience of pain.

To analyze a claimant subjective complaints, the ALJ considers the entire record, including the medical records; third-party and Plaintiff's statements; the claimant's daily activities; the duration, frequency, intensity

of pain or other subjective complaint; the dosage, effectiveness, and side effects of medication; precipitating an aggravating factor; and functional restrictions.  *Id.*  The Eleventh Circuit has stated: "credibility determinations are the province of the ALJ."  Moore, 405 F.3d at 1212 ("The ALJ may discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole.").

Although not dispositive, the ALJ may consider a claimant's daily activities when evaluating subjective complaints of disabling pain and other symptoms.  20 C.F.R. § 416.929(c)(3)(i); Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987).  *But see* Lewis v. Callahan, 125 F.3d at 1441 ("participation in everyday activities of short duration, such as housework or fishing" does not disqualify a claimant from disability).

Plaintiff bears the burden of proving that he is disabled, and consequently, is responsible for producing evidence in support of his claim. *See* 20 C.F.R. § 416.912(a); Moore, 405 F.3d at 1211.

## IV.  The Evidence

### A.  Background Information

The Plaintiff was born in 1959, making him 52 years and nine months old at the date he filed his SSI application and the alleged disability onset.

Tr. 37, 70.  20 C.F.R. § 416.963(d) (a person "closely approaching advanced age").  The Plaintiff has a college education, but no substantial gainful activity (relevant employment).  Tr. 19, 37, 39, 70; *see supra* at 4, ¶ 1.

## B.  The Relevant Medical Evidence

Plaintiff received treatment at Bond Community Health Center (Bond) from Eduardo Williams, M.D., and other providers, from April through September 2009 for chronic back disease, diabetes, anxiety, and hypertension.  Tr. 296-310.

Plaintiff began his examination and treatment with Dr. Williams on April 22, 2009.  Tr. 303.  Dr. Williams noted Plaintiff's history of insulin-dependent diabetes, insomnia, hyperlipidemia, arthritis, chronic back pain with degenerative disc disease.  *Id.*  Plaintiff brought his MRI to the examination which, according to Dr. Williams, "shows some disc degeneration.  Evidently, he has had this for many years now and has been on medication for this."  *Id.*  Plaintiff's medications included Humulin N, Glyburide, Simvastatin, Lisinopril, Metformin, and Lortab.  *Id.*  His medications were continued although he received a refill for Lortab and placed on a sliding scale for Humulin R.  Dr. Williams advised Plaintiff that they needed his old records to verify his chronic back problem and that if

they could not substantiate his degenerative disc disease, Lortab would be discontinued. *Id.*

On June 16, 2009, a lumbar spine MRI without contrast indicated: (1) broad based disc bulge, moderate bilateral facet arthropathy and trace anterolisthesis of L4 relative to L5 resulting in moderate spinal canal stenosis and bilateral neural foraminal narrowing at L4-5 with contact of the existing bilateral L4 spinal nerves; and (2) broad based disc bulge at L2-3 with did not substantially narrow the neural foremen but a left lateral component of the bulge likely contacted the left-sided L2 spinal nerve lateral to the neural foramen.  Tr. 307/349.

On July 15, 2009, Dr. Williams noted that Plaintiff "did bring a copy of his MRI report, which did show pathology consistent with symptoms" of back pain.  All other problems were stable.  Tr. 302.  Plaintiff was prescribed Lortab 10, four times daily.  *Id.*  On October 7, 2009, Dr. Williams noted Plaintiff's complaints and his assessment was "stable." Tr. 301.  Plaintiff was to continue weight loss efforts and was urged to stay compliant with diet and exercise.  *Id.*  On December 30, 2009, Plaintiff followed up with Dr. Williams for complaints "of chronic back pain, obesity, diabetes, anxiety, and depression, doing fairly well."  Tr. 300.  Plaintiff was again urged to comply with diet, medication, and exercise and was

cautioned that he was gaining weight.  Lortab was refilled, prn.  *Id.*  On

March 29, 2010, Plaintiff followed up with Temple O. Robinson, M.D., also

at Bond, for diabetes, hypertension, and obesity.  He was encouraged to

comply with dietary instructions.  Tr. 299.

On June 29, 2010, Plaintiff was examined by Kimberlee Dawne

Decker, ARNP, at Bond, as a follow-up for hypertension, diabetes mellitus,

and pain management for his back pain.  Medications were refilled

including Lortab, prn.  Tr. 298.  On September 21, 2010, Plaintiff followed

up with Dr. Robinson with no new complaints, but he needed medications

refilled.  Tr. 296/297.  Dr. Robinson noted that he "is very happy because

he states he has been admitted to a welding program and is excited about

the possibility of getting in to the workforce after completing his full

education."  *Id.*  (Plaintiff testified that he went to welding classes through

vocational rehabilitation, Tr. 48, but "just couldn't do it" physically in two

years.  Tr. 46-47.)  Plaintiff reported he had recently had his insulin

changed at the local health department in Liberty County and is able to get

his medication for free.  He was told that he needed to stick with one doctor

and to coordinate their efforts.  Dr. Robinson was concerned "that he is on

chronic narcotics and [she] told him it is imperative that you use [the] same

pharmacy all the time when he is getting his Lortab filled and to never have

two doctors prescribing at the same time unless one of the physicians knows." Plaintiff voiced his understanding and stated that he will adhere to this regimen. *Id.* Plaintiff's diabetes was uncontrolled; medications were continued; Lortab was refilled; a urine drug screen obtained; and he was counseled regarding the benefits of portion control, weight loss, and exercise. *Id.*

From April 20, 2011, through July 11, 2012, Plaintiff continued receiving treatment for chronic back pain, diabetes, hypertension, and hyperlipidemia with Dr. Williams and his new clinic (Capital Regional Medical Group (CRMG)-Tallahassee, Florida) with ongoing prescriptions of Lortab, Xanax, Soma, and Lisinopril in addition to diabetes medications and insulin provided through patient assistance at the Health Department. Tr. 315-20, 328-45,[6] 351-60,[7] 371-82. (Plaintiff transferred his care to Liberty County Health Department where he had been treated in 2009 until June 2010 and started again in August 2013. Tr. 371-82). A September

---

[6] These progress notes from the Calhoun County Health Department are handwritten and difficult to read. *Id.*

[7] These progress notes from the Calhoun County Health Department are typed and dated January 11, 2013. *Id.* These notes report Plaintiff appearing to recheck his diabetes. *Id.* Jerry D. Boland, M.D., is mentioned. Tr. 353. A patient note indicates that Plaintiff "denies" musculoskeletal problems and behavioral health disorders. Tr. 354.

2010 drug screen was negative for all substances except the prescribed opiates.  Tr. 310.

On January 19, 2012, Lourdes A. Mosley, M.G., P.A., with CRMG, noted Plaintiff's "chronic medical problems" as chronic back pain secondary to multiple motor vehicle accident" and hypertension.  It is also noted that Plaintiff "goes to school full-time in a welding class at Lively."  Tr. 318; *see supra* at 17. Chronic back pain is noted, but no numbness or focal weakness was noted.  *Id.*  Plaintiff appeared morbidly obese, but not in any distress.  *Id.*  Plaintiff's lower lumbar area was tender, but no swelling; he had good range of motion and a negative straight leg raising.  Under hypertension, it is noted "noncompliant."  *Id.*

On April 12, 2012, Plaintiff presented to Dr. Williams with no new problems, although he had not had his blood pressure medicine for about two weeks.  Plaintiff was alert and oriented and in no apparent distress.  He had no blurred vision, double vision, shortness of breath, PND or orthopnea.  Tr. 316.  On July 11, 2012, Plaintiff followed up with Dr. Williams and other than previously reported chronic back pain, hypertension, diabetes, hyperlipidemia, it was reported that he was "[c]urrently doing well.  No other problems reported."  Tr. 315.

In an undated questionnaire requested by the Commissioner regarding Plaintiff's mental status, it appears Dr. Williams noted that Plaintiff's mood and affect were within normal limits (WNL), but he experienced mild to moderate situational anxiety and insomnia.[8]  Tr. 321-32.  Plaintiff's quality and thinking, concentration, orientation, memory (immediate, recent, and remote), and behavioral observations were within normal limits.  Tr. 322.  No hallucinations and perceptual disturbances are noted.  *Id*.  Dr. Williams also opined that "[f]rom a mental standpoint [Plaintiff is] able to work."  Tr. 323.  He noted that "however, the physical and medical problems may make gainful employment difficult."  *Id*.

In August 2013, Plaintiff received a psychiatric evaluation from Apalachee Center.  The narrative/written portions of the evaluation are difficult to read.  Tr. 361-69.  The evaluation is discussed below.

*Consultative Examinations*

On October 12, 2009, Carla M. Holloman, D.O., examined Plaintiff at the Commissioner's request.[9]  Tr. 285-90.  Plaintiff reported that he was

---

[8]  The questionnaire was sent to Dr. Williams by the Commissioner on September 4, 2012, and the response is not dated, but notes Plaintiff's most recent treatment visit was July 11, 2012.  Tr. 321, 323; *see* Tr. 315 (July 11, 2012).

[9]  Dr. Holloman noted that Plaintiff was "applying for disability based on diabetes, hypertension, bulging discs in the back, numbness in the hands and feet, anxiety, obese, chronic fatigue, gout, and hearing and vision problems."  Tr. 285.

diagnosed with diabetes and hypertension 1991 and admitted to a hospital during that time for 12 days, although he had no recent hospital admissions.  Tr. 285.  Plaintiff recognized that a lot of his problems (*e.g.*, blurred vision, peripheral neuropathy in his hands and feet, associated shortness of breath with exertion, and fatigue) were related to his obesity and that he had been obese all his life.  *Id*.  Dr. Holloman noted that Plaintiff's "back pain is related to injuries to high school sports and a remote motor vehicle accident," "exacerbated with his weight" according to Plaintiff.  *Id*.  Plaintiff had been incarcerated for the past eight years and had to sleep on metal beds which made his condition worse.  "His anxiety is a component of family and financial constraints.  He is upset that he has two college degrees and can not [sic] nor has he ever worked in the field of sociology.  He feels nervous and fearful all the time.  He is having a hard time with being freed from prison and reacclimating."  *Id*.

Dr. Holloman noted that Plaintiff was "morbidly obese" at 5'11" and 298 pounds (BMI 41.6), but "alert, oriented, and in no acute distress." Tr. 286.  He was cooperative; his gait was normal and was without the use of assistive devices.  *Id*.  Regarding his "extremities," Dr. Holloman noted that he had

> No cyanosis, clubbing, or edema.  Free range of motion in all four
> extremities.  Grip and muscle strength are 5/5 throughout.  There are

> no joints showing swelling, tenderness, or increased calor.
> Peripheral pulses inclusive of the posterior tibial and dorsalis pedis
> were 2+.  The patient is able to stand from a seated position without
> incident.

Tr. 287; *see* Tr. 288-90 (range of motion results).  The results of a

neurological exam were generally normal and it was noted that Plaintiff was

"able to do tandem walking" and his "[s]traight leg raise testing is negative."

R. 287.  Regarding the back examination, Dr. Holloman noted that

Plaintiff's "spine and extremities are in good alignment.  There is

paravertebral tautness and tenderness noted in the lumbosacral spine.

*Id.*[10]  Dr. Holloman did not mention Plaintiff's June 2009 MRI.  Tr. 285-90.

George L. Horvat, Ph.D., evaluated Plaintiff on October 19, 2009, at

the Commissioner's request.  Tr. 291-94.  Dr. Horvat noted that he had

reviewed Dr. Williams' reports dated April 22, 2009, and July 15, 2009;

Annie Strickland, ARNP's report dated February 25, 2009 (two of three

pages); Dr. Boland's report of June 16, 2009; and an MR report dated June

---

[10]  The ALJ considered Dr. Holloman's evaluation.  Tr. 20-21.  The ALJ found
that Dr. Holloman's findings were generally consistent with the overall evidence of
record received at the hearing level and ultimately supported a finding that Plaintiff was
not disabled.  Tr. 21.  The ALJ gave "some weight" to her assessment and noted that he
accounted for Dr. Holloman's suggested limitations that were supported by the record in
forming Plaintiff's RFC.  *Id.*  Dr. Holloman noted that Plaintiff was able to stand from a
seated position without incident; able to do tandem walking; had negative straight leg
raising; and free range of motion in all four extremities, including Plaintiff's lumbar and
cervical spine.  Tr. 287-88.  Dr. Holloman's range of motion testing results are
consistent with Dr. Odeh's range of motion testing results.  Tr. 288-90, 383-84, 393-94.

16, 2009, but reported no previous diagnosis or Global Assessment of Functioning (GAF) scores were available.[11]  Tr. 292.

Dr. Horvat noted Plaintiff's reports of depression, anxiety, insomnia, and racing thoughts, and noted Plaintiff's depressed mood and affect and limited memory of examination.  Tr. 292-94.  Plaintiff denied any history of treatment for mental health issues, but reported that he received inpatient treatment at a prison facility drug program.  Tr. 293.

---

[11]  The ALJ afforded "little weight to" Plaintiff's GAF scores.  Tr. 22.  The American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000) includes the GAF Scale that is primarily used by mental health practitioners.  The GAF Scale is used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to only psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." *See* DSM-IV-TR 32-34.  The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale.  *Id.  See* Nichols v. Astrue, Case No. 3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012) (discussing the GAF scale).  A score of 31-40 is defined as manifesting "[s]ome impairment in realty testing or communication (e.g., speech is at times illogical, obscure, or irrelevant)" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  DSM-IV-TR at 34.  A GAF scale rating of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational or school functioning.  *Id.*  A GAF scale rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*  The "Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'"  Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (unpublished) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)).  In the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) (2013), "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice.  In order to provide a global measure of disability, the WHO DSM-5 (see the chapter "Assessment Measures")."  DSM-5 at 16.

Dr. Horvat noted, regarding Plaintiff's mental status that his attention and concentration were normal, but his memory was limited as he missed two of three items after five minutes.  He was oriented times four.  He was cooperative throughout the interview.  His mood and affect were depressed, although the speech flow was normal and his thought content was appropriate to his mood and circumstances.  He was preoccupied with his pain; showed no signs of hallucinations and his organization was logical.  His intelligence level and fund of knowledge appeared to be average.  Tr. 293.  His abstraction, decision-making, and judgment were normal; his reality testing was adequate; and he used his connections. Tr. 294.

Dr. Horvat opined that Plaintiff's "illness appears to be his main stressor, and his coping ability was overwhelmed" and "[h]is social judgment is street smart, and he isolates due to his illness."  Tr. 294. Dr. Horvat's diagnoses included adjustment disorder with anxiety and depressed mood and pain disorder.  *Id.*  Dr. Horvat assigned Plaintiff a current GAF of 50 and further noted that he was capable of handling finances.  *Id.*; *see supra* at n.11.  Dr. Horvat concluded that if Plaintiff "can be cleared physically, there are no psychological reasons why he cannot work.  The psychological treatment program can be scheduled around his

work commitments.  He is in need of a referral to Vocational Rehabilitation for employment evaluation."[12]  *Id.*

On August 8 and 13, 2013, Plaintiff was evaluated at the Apalachee Center, and reported anxiety for "many years" with current symptoms of crying all the time, increased anger, insomnia, bad dreams, impulsivity, and fleeting suicidal ideation.  Tr. 361.  Plaintiff was noted to be talkative/hyperverbal, circumstantial, and hyperactive with flight of ideas.  His insight and judgment were fair.  Tr. 361, 363.  Plaintiff was diagnosed with Depression, rule out bipolar, for which he was prescribed Tegretol and Zoloft.  Tr. 364, 369.  His GAF score was 55, although it was 40 on the first day of the evaluation.  Tr. 364, 369; *see supra* at n.11.

Plaintiff testified at the October 31, 2013, hearing that he had been going to the Apalachee Center for about three months and had his last appointment at the Apalachee Center the prior Friday before his hearing.  He received counseling "[e]very couple months," but not on a regular schedule.  He recalled meeting with a psychologist, then a nurse practitioner.  He thought he was prescribed medication by a psychologist.

---

[12]  The ALJ considered Dr. Horvat's evaluation.  Tr. 21.  The ALJ afforded his assessment "some weight," and like his assessment of Dr. Holloman's findings, stated that he fully accounted for Dr. Horvat's suggested limitations that were supported by the record in forming Plaintiff's RFC, although again noting that like Dr. Holloman, Dr. Horvat did not have the benefit of reviewing all the evidence received at the hearing level prior to making this assessment.  *Id.*

Prior to going to the Apalachee Center, Plaintiff talked to Dr. Williams, and Dr. Boland [phonetic] "a couple of years ago."  He explained that he only sought formal mental health treatment within the last three months because it was "[s]omething [he] was ashamed of."  They put him on Tegretol for a mood stabilizer and said he was bipolar.  He also takes Zoloft.  He still gets mood swings, but "not as bad as it was, but still have them."  Tr. 45-46, 48-49.  (Treatment notes from Apalachee Center after the August 2013 evaluations are not in the record.  *See infra* at 45-51.)

On August 28, 2013, Plaintiff was examined by Steve O. Odeh, M.D., at the Commissioner's request.  Tr. 383-96.  (The examination occurred approximately two months before the hearing.  Tr. 12.)  Alleged impairments included difficulty breathing, back pain, hypertension, diabetes mellitus, depression, and bipolar disorder.  Tr. 392.  Plaintiff reported "that MRI performed in 2009 revealed degenerative disk disease with herniation in the lumbar spine.  He uses medications for pain control but achieves marginal relief only."  *Id.*  Generally, examination revealed an obese male that was appropriately dressed, did not appear acutely ill, and was cooperative.  Plaintiff was oriented to time, place, and persons and able to hear normal conversation and spoke well.  Tr. 393.  The results of his examination of Plaintiff's back and, in particular, indicated that his cervical

and lumbar spine areas were non-tender and he had full range of motion. Tr. 383, 393.  The straight leg raising was negative for his lumbar spine. His thoracic spine had a normal curvature and was non-tender.  Tr. 393. Examination of Plaintiff's extremities was generally normal, *e.g.*, non-tender with full range of motion.  Tr. 393.

A review of Plaintiff's neurological system revealed that he was awake, alert, and oriented times three with normal motor strength, although Dr. Odeh noted pain with heel and toe walking and a mildly antalgic gait. Tr. 394.  Dr. Odeh diagnosed shortness of breath (nonspecific), back pain, hypertension, and diabetes mellitus.  *Id.*  He further noted that Plaintiff "reports no difficulty with sitting, but has difficulties with prolonged standing and walking.  The physical examination shows full ROM across all joints." *Id.*  Dr. Odeh concluded: "There are few clinical examination findings precluding work engagement at this time.  If approved for disability, the claimant appears capable of managing resources independently."  *Id.*

In a Medical Source Statement of Ability to do Work-Related Activities (Physical), also completed on August 28, 2013, Dr. Odeh opined that Plaintiff could lift and carry up to 20 pounds frequently and up to 50 pounds occasionally; could sit two hours of the time and up to four hours total in an eight-hour workday; *stand 20 minutes at a time and up to two hours in an*

*eight hour workday; walk 20 minutes at a time and up to one hour in the*

*work day, and that the remaining one hour of an eight hour workday would*

*be spent with "rest periods."*  Tr. 386-87.  Plaintiff did not require the use of

a cane to ambulate.  Tr. 387.  In addition, Plaintiff was limited to "frequent"

manipulative limitations, occasional postural limitations, and had

environmental and noise exposure restrictions.  Tr. 388-90.  Dr. Odeh

noted (checked boxes), in part, that Plaintiff can perform activities like

shopping; ambulate without assistive devices; walk a block at a reasonable

pace on rough or uneven surfaces; and climb a few steps at a reasonable

pace with the use of a single handrail.  Tr. 391.  Dr. Odeh opined that the

noted limitations had been effective for two years and that his opinions

were based on Plaintiff's "history [and] physical."  Tr. 387-91.

The ALJ mentioned that Dr. Odeh stated that Plaintiff "subjectively

reported difficulty with 'prolonged' standing."  Tr. 22, *see* Tr. 394.  The ALJ

mentioned Dr. Odeh's diagnoses and stated that he (the ALJ) found

Plaintiff *somewhat more limited* based on the overall evidence received at

the hearing and, accordingly, afforded his assessment less than significant

weight.  Tr. 22.  Nevertheless, the ALJ noted that he fully accounted for

Dr. Odeh's suggested limitations that were supported by the record in

forming Plaintiff's RFC and further noted that Dr. Odeh did not have the

benefit of reviewing all the evidence received at the hearing level prior to

making his assessment.  *Id.*  Dr. Odeh's stand and walk limitation was

included in a hypothetical to the VE who opined that Plaintiff could not

perform any of this past work  and that no jobs were available because the

sitting, standing, and walking time "only adds up to seven hours."  Tr. 66-

67, 387.  The ALJ did not include Dr. Odeh's opinion regarding Plaintiff's

stand and walk limitations emphasized above when he made his RFC

assessment and did not expressly explain why he did not include these

limitations in his RFC assessment.  *Compare* Tr. 18 and 66-67

(hypothetical to VE) *with* Tr. 387.

>    *Non-Examining Medical Source Opinions*

On September 18 and October 22, 2012, non-examining

psychologists John Thibodeau, Ph.D., and Byron T. Pack, Psy.D., as part

of the initial review and reconsideration of Plaintiff's application for benefits

(DI claim), respectively, opined that Plaintiff's mental impairments were

non-severe.  Tr. 75, 86.  (The September 2012 opinion by SDM Jasmine

Plummer is a non-medical opinion.  Tr. 75-77.)

On October 24, 2012, and as part of the reconsideration process of

Plaintiff's application for benefits, non-examining physician, P.S.

Krishnamurthy, M.D., performed a record review of several notes and

opined that Plaintiff could perform a range of light work with postural and environmental limitations.  Tr. 86-90.

*Weight ALJ Gave to Opinions*

The ALJ accorded "significant weight" to the opinion of Dr. Krishnamurthy, Tr. 23-24; "less than significant weight" to the Medical Source Statement and opinions of the "treating source," Dr. Williams, Tr. 24, and also to the opinions of Dr. Odeh, an examining physician/consultant, Tr. 22; "some weight" to the opinions of Drs. Holloman and Horvat, Tr. 21; and "some weight" to the opinions of Drs. Thibodeau and Pack, Tr. 23.

Toward the end of his RFC findings, the ALJ noted: "Pursuant to Eleventh Circuit case law and regulations, the undersigned gives *greater weight* to the treating and examining physician's reports as summarized herein."  Tr. 24 (emphasis added).  The treating and examining physicians are Dr. Williams and others at Bond, the Liberty County and Calhoun County Health Departments, CRMC, and the Apalachee Center. Tr. 20-22.  (As noted above, the ALJ gave "*less than significant weight*" to Dr. Williams' Medical Source Statement and opinions in Exhibit 5F, Tr. 321-24.  Tr. 24 (emphasis added).)  The examining consultants are

Drs. Holloman, Horvat, and Odeh.  Tr.  20-22.  The non-examining

consultants are Drs. Thibodeau, Pack, and Krishnamurthy.  Tr. 23-24.

### C.  Plaintiff's Pre- and Post-Hearing Statements and Hearing Testimony; Vocational Expert's Testimony

The ALJ considered Plaintiff's pre-hearing and hearing testimony and

pre-hearing statements at step three and when assessing Plaintiff's RFC.

Tr. 16-18, 19-20, 24.  The ALJ also considered reports from Plaintiff's friend

and neighbor and his father and gave them "less than significant weight"

because of their status as lay (non-medical) sources.  Tr. 24.  The pertinent

portions of the ALJ's consideration of this evidence is derived from the

ALJ's assessment of Plaintiff's RFC.

> Overall, while the record supports some level of functional limitations related to the claimant's impairments, it does not support such significant limitations as alleged by the claimant.  Many of the allegations and symptoms alleged by the claimant appear to be disproportionate to the expected severity and duration that would be reasonably expected on the basis of the claimant's medically determinable impairments.  In making this finding, the undersigned has considered each of the claimant's impairments individually and in combination with all medically determinable impairments discussed in this decision.

> The claimant is a fifty-four year old male with a college education who is asserting disability due to a combination of allegedly debilitating impairments and associated symptomatology (Exhibits B3E; B6E; B9E; B11E; B14E; Hearing Testimony).  The claimant alleges that as a result of substantial limitations in his mobility, exertional, and non-exertional abilities caused by his severe medically determinable impairments, he is unable to return to any

of his previous work, and/or any other job in the national and/or local economy.

The claimant alleges physical limitations that include neck, back, arm, hand, finger, and leg pain, as well as difficulty lifting, squatting bending, standing, reaching, walking, sitting, kneeling, hearing, stair climbing seeing, and using his hands (Exhibits B3E; B6E; B9E; B11E; B14E; Hearing Testimony). The claimant alleges mental limitations that include difficulty remembering, completing tasks, understanding, following instructions, and getting along with others, as well as the associated symptoms of bipolar disorder (Exhibits B3E; B6E; B9E; B11E; B14E; Hearing Testimony). The claimant reports taking aspirin, metformin, zoloft, tegretol, lisinopril, crestor, acupril, glyburide, lortab, lipitor, xanax, albuterol, insulin, and prozac for his alleged impairments, as well as medication side effects consisting of dizziness, drowsiness, and lethargy (Exhibits B3E; B9E; B14E; B16E; Hearing Testimony).

The claimant reported to Social Security personnel that he experiences back and leg pain and has exertional limitations (Exhibits B6E; B9E). The claimant also reported that he has mobility limitations and is unable to complete daily activities (Exhibits B6E; B9E). The claimant further reported that he experiences psychologically based symptoms characterized by mood swings and crying spells (Exhibits B6E; B9E; B14E). Additionally, the claimant reported that he has cognitive problems secondary to bipolar disorder (Exhibits B6E; B9E).

During the hearing, the claimant testified that he lies down about half the time due to pain in his neck and back (Hearing Testimony). The claimant also testified that he has a history of psychological issues secondary to bipolar disorder and has memory issues occasionally (Hearing Testimony). The claimant further testified that he experiences numbness and tingling in his hands and feet and has trouble walking (Hearing Testimony). Additionally, the claimant testified that he props his legs up several times during the day due to swelling in his feet (Hearing Testimony). The objective

medical evidence of record does not support the claimant's allegations regarding the intensity, persistence, and limiting effects of his symptoms.

Notwithstanding the claimant's subjective complaints, the overall evidence of record received at the hearing level reflects that the claimant can ambulate effectively without the use of an assistive device, his symptoms are controlled with prescribed medication, and he is able to function adequately in a full range of routine activities of daily living with occasional and/or no assistance, which include: bathing himself, dressing himself, feeding himself, caring for his hair, dialing a telephone, using a computer, shopping in stores, buying groceries, using the toilet, preparing light meals, completing light household chores, riding in a car, going to doctor's appointments, picking up medicine, visiting family, visiting friends, associating with family, associating with friends, spending time with others in person, spending time with others on the phone, spending time with other on the computer, watching television, reading books, reading magazines, counting change, paying bills, going outside alone, and going outside daily (Exhibits B6E; B9E; B2F; B13F; Hearing Testimony).

Tr. 19-20; *see* Tr. 37-62 (Hearing Testimony).  Ultimately, the ALJ found

that Plaintiff's allegations were "not entirely credible."  Tr. 23.

*Vocational Expert Testimony*

Robert N. Strader testified as the vocational expert during the

October 2013 hearing.  Tr. 61-68.  The ALJ asked the VE to assume a

hypothetical individual with the limitations ultimately adopted as the RFC

findings:

Q I would like you to assume a hypothetical individual with the same aged [sic] education, and past work experience of this claimant, who

could occasionally lift 20 pounds and frequently 10 pounds, stand and walk for six hours out of eight hour day, and sit for six hours out of eight hour day could frequently balance, kneel, climb, occasionally climb ladders, ropes, or scaffolding, occasionally stoop, crouch, crawl.  This individual should avoid concentrated exposure to extreme heat, humidity, wetness, vibration, and hazards.  Could such an individual perform any of the claimant's past work?

Tr. 64-65.  The ALJ then asked the VE to assume "that he doesn't have any past work."  Tr. 65. The VE opined that such an individual could perform the work of storage rental clerk, office helper, and housekeeper, with the added limitations that such an individual was able to do only simple, routine, repetitive work with only frequent contact with the public, co-workers, or supervisors, and no more than a regular pace.  Tr. 65-66.

The ALJ changed the standing and walking requirements of the previous hypotheticals to two out of eight instead of six out of eight and the VE agreed with the ALJ that these changes would normally put the individual into a sedentary exertional capacity which would mean that the individual would not be able to do past work.  Tr. 66.  The VE also opined that there would not be any semi-skilled occupations that the individual with these limitations could perform which required the skills the Plaintiff may have acquired in his past work as a delivery truck driver, but with no additional skills.  *Id.*

The VE was then asked to consider limitations noted in "Exhibit 13F,"

from Dr. Odeh, Tr. 383-96, which specify that an individual could:

> [O]ccasionally lift 21 to 50 pounds, frequently lift 11 to 20 pounds; *sit for four hours out of eight hour day, stand two hours out of an eight hour day, walk for one hour out of eight hour day with rest periods to make up the eight hour workday*, frequently reach, handle, finger, feel, push and pull, occasionally climb, stoop, kneel, crouch, crawl; frequently balance, no ladders, ropes, or scaffolding. . . .

Tr. 66-67 (emphasis added).[13]  The VE agreed that without consideration of

any environmental limitations, such an individual could not perform any of

Plaintiff's past work.  Tr. 67.  The VE testified no jobs would be available

because the sitting, standing, and walking time "only adds up to seven

hours."  *Id.*; *see* Tr. 387.  The vocational expert testified that his testimony

was consistent with the DOT.  Tr. 67.

## V.  Legal Analysis

### A.  Substantial evidence supports the ALJ's RFC determination and his credibility determinations of Plaintiff.

Plaintiff argues that the ALJ's RFC determination that Plaintiff is able

to perform light work with exceptions, Tr. 18, is not supported by substantial

evidence because the ALJ did not "explain why he rejected the portion of

_____

[13]  Dr. Odeh, in his Medical Source Statement of Ability to do Work-Related Activities (Physical) of August 28, 2013, Tr. 383-94, opined, in part, that Plaintiff could sit for four hours in an eight-hour workday; stand for two hours in an eight-hour workday; and walk for one hour in an eight-hour workday, accounting for seven hours of an eight-hour workday.  Tr. 387.

Dr. Odeh's opinion that would have resulted in a finding of disability."  ECF No. 18 at 11-15.  Plaintiff also argues that the ALJ's credibility determination is not supported by substantial evidence.  ECF No. 18 at 16-22.

In the narrative portion of Dr. Odeh's Consultative Examination Report, Dr. Odeh provided a history of Plaintiff's complaints as stated by Plaintiff.  Tr. 392.  Plaintiff's breathing difficulties began one year ago.  Plaintiff had been a welder for the past several years and currently complained of constant shortness of breath.  He reported an inability to walk upstairs and he is orthopneic [sic].  He is unable to perform yard work.  Tr. 392.

Plaintiff complained of mid-back and lower back pain that had been present for 12 years that was based on previous football injuries, obesity, and motor vehicle accidents.  *Id.*  Plaintiff complained of throbbing pain graded at 8/10 on the pain severity scale.  *Id.*  Plaintiff reported

> difficulties with bending movements, stooping and squatting.  He states that the pain is nonradiating.  There is no history of numbness, swelling or weakness of the lower extremities.  He states that he has known gouty arthritis.  The patient states that MRI performed in 2009 revealed degenerative disk disease with herniation in the lumbar spine.  He uses medications for pain control but achieves marginal relief only.

*Id.*

Dr. Odeh stated, in material part, in his Medical Source Statement which is part of the Consultative Examination Report, that Plaintiff reported "no difficulty sitting, *but has difficulties with prolonged stand and walking*. The physical examination shows full ROM across all joints.  He is recommended to follow up with his primary care physician for management of his underlying clinical conditions."  Tr. 394 (emphasis added); *see supra* at 26-29.  He also opined that "there are few clinical examination findings precluding work engagement at this time."  Tr. 394.  Dr. Odeh offered no opinions regarding the type of work, *e.g.*, light, sedentary, *etc.*, that Plaintiff could perform.

Dr. Odeh, in his Medical Source Statement of Ability to do Work-Related Activities (Physical) of August 28, 2013, Tr. 383-94, which is part of the Consultative Examination Report, opined, in part, that Plaintiff could lift and carry up to 20 pounds frequently and up to 50 pounds occasionally; could sit two hours of the time and up to four hours total in an eight-hour workday; *stand 20 minutes at a time and up to two hours in an eight hour workday; walk 20 minutes at a time and up to one hour in the work day, and that the remaining one hour of an eight hour workday would be spent with "rest periods."*  Tr. 386-87.  Plaintiff did not require the use of a cane to ambulate.  Tr. 387.  In addition, Plaintiff was limited to frequent

manipulative (use of hands) limitations, occasional postural limitations, and had environmental and noise exposure restrictions.  Tr. 388-90.  Dr. Odeh noted (checked boxes), in part, that Plaintiff can perform activities like shopping; can walk a block at a reasonable pace on rough or uneven surfaces; can ambulate without assistive devices; and can climb a few steps at a reasonable pace with the use of a single handrail.  Tr. 391. Dr. Odeh noted that the limitations had been effective for two years and that his opinions were based on Plaintiff's "history [and] physical."  Tr. 387-91.

The ALJ mentioned that Dr. Odeh stated that Plaintiff "subjectively reported difficulty with 'prolonged' standing."  Tr. 22, *see* Tr. 394.  The ALJ mentioned Dr. Odeh's diagnoses and stated that he (the ALJ) found Plaintiff *somewhat more limited* based on the overall evidence received at the hearing and, accordingly, afforded his assessment less than significant weight.  Tr. 22.  Nevertheless, the ALJ noted that he fully accounted for Dr. Odeh's suggested limitations that were supported by the record in forming Plaintiff's RFC and further noted that Dr. Odeh did not have the benefit of reviewing all the evidence received at the hearing level prior to making his assessment.  *Id.*

The ALJ did not include Dr. Odeh's opinion regarding Plaintiff's stand and walk limitations emphasized above when he made his RFC assessment and did not expressly explain why he did not include these limitations in his RFC assessment.  *Compare* Tr. 18 and 66-67 (hypothetical to VE) *with* Tr. 387.  Rather, Dr. Odeh's stand and walk limitation was included in a second hypothetical to the VE who opined that Plaintiff could not perform any of this past work and that no jobs were available because the sitting, standing, and walking time "only adds up to seven hours."  Tr. 66-67, 387.

Although not expressly mentioned by the ALJ in his decision, Tr. 22, Dr. Odeh opined that Plaintiff could occasionally lift 21 to 50 pounds; frequently lift 11 to 20 pounds; and continuously lift and carry up to 10 pounds.  Tr. 386.  The ALJ implicitly rejected this opinion because he asked the VE to assume a hypothetical individual could occasionally lift 20 pounds and frequently 10 pounds and the ALJ included these limitations in his RFC assessment, Tr. 18.  Tr. 64-65.  The ALJ implicitly rejected Dr. Odeh's stand and walk limitation.  *Compare* Tr. 18, 64-65 *with* Tr. 387-89.

The ALJ did not, however, expressly identify the evidence that supported his rejection of Dr. Odeh's standing and walking limitation,

although the ALJ noted, in part, Plaintiff's subjective report to Dr. Odeh

having difficulty with 'prolonged' standing; reported difficulty standing and

walking; experiencing "numbness and tingling in his hands and feet and

has trouble walking"; and that "he props his legs up several times during

the day due to swelling in his feet."  Tr. 19-20.  On the other hand, the ALJ

further found that Plaintiff

> can ambulate effectively without the use of an assistive device,
> his symptoms are controlled with prescribed medication, and he
> is able to function adequately in a full range of routine activities of
> daily living with occasional and/or no assistance, which include:
> bathing himself, dressing himself, feeding himself, caring for his hair,
> dialing a telephone, using a computer, shopping in stores, buying
> groceries, using the toilet, preparing light meals, completing light
> household chores, riding in a car, going to doctor's appointments,
> picking up medicine, visiting family, visiting friends, associating with
> family, associating with friends, spending time with others in person,
> spending time with others on the phone, spending time with other on
> the computer, watching television, reading books, reading
> magazines, counting change, paying bills, going outside alone, and
> going outside daily (Exhibits B6E; B9E; B2F; B13F; Hearing
> Testimony).

Tr. 20.  (Exhibit B6E is a Sept. 7, 2012, Function Report; Exhibit B9E is a

Sept. 11, 2012, Pain Questionnaire; Exhibit B2F is Dr. Horvat's evaluation;

Exhibit B13F is Dr. Odeh's evaluation.  Tr. 383-95.)

On October 12, 2009, without the benefit of the June 2009 MRI,

Dr. Holloman noted that Plaintiff was "morbidly obese" at 5'11" and 298

pounds (BMI 41.6), but "alert, oriented, and in no acute distress."  Tr. 286.

He was cooperative; his gait was normal and was without the use of
assistive devices.  *Id.*  Regarding his "extremities," Dr. Holloman noted that
he had

> No cyanosis, clubbing, or edema.  Free range of motion in all four
> extremities.  Grip and muscle strength are 5/5 throughout.  There are
> no joints showing swelling, tenderness, or increased calor.
> Peripheral pulses inclusive of the posterior tibial and dorsalis pedis
> were 2+.  The patient is able to stand from a seated position without
> incident.

Tr. 287; *see* Tr. 288-90 (range of motion results).  The results of a
neurological exam were generally normal and it was noted that Plaintiff was
"able to do tandem walking" and his "[s]traight leg raise testing is negative."
R. 287.  Regarding the back examination, Dr. Holloman noted that
Plaintiff's "spine and extremities are in good alignment.  There is
paravertebral tautness and tenderness noted in the lumbosacral spine.
*Id.*[14]

Based on a record review, on October 24, 2009, Dr. Krishnamurthy, a
non-examining physician, provided an RFC assessment and noted that
Plaintiff had exertional, postural, and environmental limitations.  Tr. 86-88.

---

[14]  The ALJ considered Dr. Holloman's evaluation.  Tr. 20-21.  The ALJ found
that Dr. Holloman's findings were generally consistent with the overall evidence of
record received at the hearing level and ultimately supported a finding that Plaintiff was
not disabled.  Tr. 21.  The ALJ gave "some weight" to her assessment and noted that he
accounted for Dr. Holloman suggested limitations that were supported by the record in
forming Plaintiff's RFC.  *Id.*

Relevant here, Dr. Krishnamurthy opined that Plaintiff was able to stand and/or walk and sit (with normal breaks) for "about 6 hours in an 8-hour workday."  Tr. 87.

Dr. Krishnamurthy provided additional explanations for the RFC assessment that included review of Dr. Holloman's evaluation of October 12, 2009; Ms. Mosley's (with CRMG) follow-up notes of January 19, 2012; and Dr. Williams' follow-up notes of April 12, 2012, and July 11, 2012.[15] There is no mention of the June 2009 MRI, Tr. 307/349.  Tr. 88.

Dr. Krishnamurthy also noted that Plaintiff lived alone, personal care was okay, used a microwave for cooking, did some cleaning, and shopped. *Id.*  Dr. Krishnamurthy opined that Plaintiff could perform light work based on seven strength factors that included standing and walking.  Tr. 89. Although the ALJ noted that Dr. Krishnamurthy did not have the benefit of

---

[15]  On January 19, 2012, Lourdes A. Mosley, M.G., P.A., with CRMG, noted Plaintiff's "chronic medical problems" as chronic back pain secondary to multiple motor vehicle accident" and hypertension.  It is also noted that Plaintiff "goes to school full-time in a welding class at Lively."  Tr. 318; *see supra* at 17-19.  Chronic back pain is noted, but no numbness or focal weakness was noted.  *Id.*  Plaintiff appeared morbidly obese, but not in any distress.  *Id.*  Plaintiff's lower lumbar area was tender, but no swelling; he had good range of motion and a negative straight leg raising.  Under hypertension, it is noted "noncompliant."  *Id.*  On April 12, 2012, Plaintiff presented to Dr. Williams with no new problems, although he had not had his blood pressure medicine for about two weeks.  Plaintiff was alert and oriented in no apparent distress. He had no blurred vision, double vision, shortness of breath, PND or orthopnea.  Tr. 316.  On July 11, 2012, Plaintiff followed up with Dr. Williams and other than previously reported chronic back pain, hypertension, diabetes, hyperlipidemia, it was reported that he was "[c]urrently doing well.  No other problems reported."  Tr. 315.

reviewing all the evidence received at the hearing level prior to making the assessment, which is a consistent statement made by the ALJ throughout his decision regarding other medical source statements, *see* Tr. 21-24, the ALJ considered Dr. Krishnamurthy's assessment and afforded it "significant weight."  Tr. 24.  Also, the ALJ stated that he had "fully accounted for Dr. Krishnamurthy's suggested limitations that are supported by the record in forming [Plaintiff's RFC]" that included Dr. Krishnamurthy's sit, stand, and walk limitations.  *Compare* Tr. 18 *with* Tr. 76.

An RFC is the most a claimant can still do despite limitations.  20 C.F.R. § 416.945(a)(1).  It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records.  *Id.*  The responsibility for determining claimant's RFC lies with the ALJ.  20 C.F.R. § 416.946(c); SSR 96-5p, 1996 SSR LEXIS 2, at *5 (July 2, 1996).  In determining Plaintiff's RFC, the ALJ properly declined to accept, as controlling, Dr. Odeh's opinion that Plaintiff had a limited ability to stand, walk, and sit.

The ALJ gave Dr. Odeh's reports "less than significant weight" when expressly discussing his assessment (Exhibit B13F), but overall and as an examining physician, the ALJ gave his reports "greater weight."  Tr. 24.

The ALJ also gave "greater weight" to the reports of Dr. Holloman, an examining physician, and Plaintiff's treating physician, Dr. Williams.  The ALJ was permitted to give more weight to the opinion of Dr. Krishnamurthy, a non-examining, physician consultant because it was supported by the record.  *See* 20 C.F.R. § 416.927(c)(3); Fries v. Comm'r of Soc. Sec., 196 F. App'x 827, 833 (11th Cir. 2006) (unpublished) (allowing ALJ to rely on non-examining physician opinions when consistent with record).  Substantial evidence supports the ALJ's RFC assessment.

The above analysis is reinforced in light of the ALJ's credibility determinations that were adverse to Plaintiff, which Plaintiff argues were not supported by substantial evidence.  ECF No. 18 at 16-22. The ALJ noted "[i]nconsistent reports and testimony from [Plaintiff] and the fact that the record contains observations of generally stable examination findings, with some improvement in condition when compliant with conservative treatment, detract from the credibility of [Plaintiff's] allegations as to his functional limitations and the severity of his alleged symptoms."  Tr. 22. Toward the end of his RFC assessment findings, the ALJ concluded:

> After fully considering the objective medical evidence of record, the claimant's subjective complaints, and the treatment required for the claimant's conditions, the undersigned concludes the overwhelming evidence, in light of the undersigned's assessment of the claimant's credibility, supports his ability [to] perform a reduced range of light work.

Tr. 24.

The ALJ found the objective medical evidence did not support the severity of symptoms Plaintiff allegedly experienced, which the ALJ is allowed to consider.  Tr. 22.  The ALJ's decision reflects that he properly considered Plaintiff's subjective complaints, the objective medical findings, and other relevant evidence in assessing Plaintiff's RFC, and the credibility of Plaintiff's allegations of disabling limitations.  20 C.F.R § 416.929(c)(2); Wilson, 284 F.3d at 1225-26.

The burden is on the claimant to prove that he is disabled.  Bell v. Bowen, 796 F.2d 1350, 1352 (11th Cir. 1986) (citing 20 C.F.R. §§ 404.1525, 404.1526); Wilkinson v. Bowen, 847 F.2d 660, 663 (11th Cir. 1987).  This Court's "limited review precludes deciding the facts anew, making credibility determinations, or reweighing the evidence."  Moore, 405 F.3d at 1211 (citing Bloodsworth, 703 F.2d at 1239).  Plaintiff did not prove he was more limited than found by the ALJ, who applied the correct standards and properly rejected Dr. Odeh's stand and walk limitations. Substantial evidence supports the ALJ's credibility determinations.  No error has been shown.

## B.  The ALJ did not err in not developing the record regarding Plaintiff's mental impairment and limitations.

Plaintiff argues that the ALJ erred in failing to develop the record regarding Plaintiff's mental impairment and limitations because he did not request a psychological, consultative examination that had been requested by Plaintiff's counsel, Tr. 69/283, prior to the hearing.  ECF No. 18 at 22-24.

On September 17, 2013, Plaintiff's counsel advised the ALJ that "there has been no recent consultative examination" and that "it might be worth considering a psychological evaluation."  Tr. 69/283.  This request was not mentioned or renewed during the hearing.  Tr. 34-68.  This one-page letter appears in the record after the hearing transcript, Tr. 69, and is attached to Plaintiff's January 22, 2014, letter to the Appeals Council. Tr. 283.  Plaintiff's counsel advised the Appeals Council of his prior request and requested that the "matter be remanded for further development of evidence relating to claimant psychological impairment and limitations." Tr. 282.  The Appeals Council noted the request as an exhibit (Exhibit 18E), Tr. 280-83, but did not expressly rule on any of Plaintiff's claims of error.  Tr. 1-6.

Plaintiff bears the burden of proving that he is disabled, and consequently, is responsible for producing evidence in support of his claim. *See* 20 C.F.R. § 416.912(a); <u>Moore v. Barnhart</u>, 405 F.3d at 1211.  On the other hand, an ALJ has a clear duty to fully and fairly develop the

administrative record.  Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995);

20 C.F.R. § 416.912(d).  The regulations provide that if the evidence is

insufficient to determine whether the claimant is disabled or the adjudicator

cannot reach a conclusion about whether the claimant is disabled, the

adjudicator "may" order a consultative examination.  20 C.F.R.

§ 416.920b(c)(1), (c)(3).  The regulations do not require ordering a

consultative examination unless the ALJ deems it necessary.  Moreover,

although the ALJ "has a basic obligation to develop a full and fair record,

. . . . there must be a showing of prejudice before it is found that the

claimant's right to due process has been violated to such a degree that the

case must be remanded . . . . for further development of the record."

Graham v. Apfel, 129 F.3d 1420, 1422-23 (11th Cir. 1997) (citations

omitted). The question here is whether there are "the kinds of evidentiary

gaps in the record which have resulted in prejudice sufficient to justify a

remand."  Graham v. Apfel, 129 F.3d at 1423.

Plaintiff did not show that not requesting another consultative

psychological examination resulted in an unfair proceeding or clear

prejudice.  Graham v. Apfel, 129 F.3d at 1423.  The record contains

sufficient evidence for the ALJ to have made an informed decision

regarding Plaintiff's mental status.

The ALJ determined at step two that Plaintiff had several severe impairments including bipolar disorder.  Tr. 14.  The ALJ referred to Dr. Horvat's 2009, psychological, consultative examination and to the most recent August 13, 2013, evaluation at the Apalachee Center, which characterized Plaintiff's "diagnosis as bipolar disorder," which served as the basis for the ALJ adding it as a severe impairment.  Tr. 14-15.  The ALJ noted that "[a]lthough the claimant subjectively reported social limitations secondary to bipolar disorder, Dr. Horvat noted that the claimant is street smart and was cooperative during the clinical interview (Exhibit B2F)." Tr. 16; *see* Tr. 293-94.  The ALJ noted that Plaintiff's "speech flow was normal and the claimant displayed average verbal skills based on his answers during the clinical interview (Exhibit B2F)" and that his observations were supported by the evidence of record.  Tr. 16-17.  The ALJ determined that in light of Plaintiff's clinical treatment history, subjective complaints, the overall evidence received at the hearing level," "the evidence of record supports moderate difficulties in maintaining social functioning."  Tr. 17.

The ALJ concluded that Plaintiff was moderately impaired regarding his concentration, persistence, or pace, based on Dr. Horvat's observations, prehearing statements, Plaintiff's hearing testimony, and

what appears to be historical reported information set forth in Dr. Odeh's Consultative Examination Report (Exhibit B13F).  Tr. 17-18.

The ALJ considered Dr. Horvat's evaluation when he assessed Plaintiff's RFC and concluded that his "findings are generally consistent with the overall evidence of record received at the hearing level and ultimately supported a finding of 'not disabled."  Tr. 21.  The ALJ afforded Dr. Horvat's "assessment some weight" and that he "fully accounted for Dr. Horvat's suggested limitations that are supported by the record in forming the claimant's [RFC]."  Tr. 21.

The ALJ also considered the Medical Source Statement (Mental Status Report) and opinions of treating physician, Dr. Williams (Exhibit 5F) and gave them "less than significant weight because of their general inconsistency with the overall evidence of received at the hearing level (Exhibit 5F)."  As with other medical source opinions, the ALJ noted that Dr. Williams did not have the benefit of reviewing all the evidence received at the hearing level prior to making the assessment.  Tr. 24.

In an undated questionnaire (Mental Status Report) requested by the Commissioner regarding Plaintiff's mental status, it appears Dr. Williams noted that Plaintiff's mood and affect were within normal limits (WNL), but he experienced mild to moderate situational anxiety and insomnia.  Tr. 321-

32; *see supra* at n.8.  Plaintiff's quality and thinking, concentration, orientation, memory (immediate, recent, and remote), and behavioral observations were within normal limits.  Tr. 322.  No hallucinations and perceptual disturbances are noted.  *Id.*  Dr. Williams also opined that *"[f]rom a mental standpoint [Plaintiff is] able to work."*  Tr. 323 (emphasis added).  He noted that "however, the physical and medical problems may make gainful employment difficult."  *Id.*

The ALJ also considered the August 8 and 13, 2013, evaluations at Apalachee Center, the diagnosis of bipolar disorder, and also that the evaluation indicated Plaintiff "subjectively reported depressive radiations characterized by mood swings, fatigue, and crying spells (Exhibit B11F)," Tr. 361-69.  Tr. 22.

As part of his RFC assessment, the ALJ included that Plaintiff "is able to do only simple, routine, repetitive work.  He is limited to frequent contact with the public, co-workers, and/or supervisors.  He can work no more than a regular pace."  Tr. 18.

Based on the foregoing, Plaintiff did not demonstrate that the ALJ erred in not requesting an updated consultative psychological examination.  Further, because Plaintiff was represented by counsel, the ALJ did not have a heightened duty to probe into all relevant facts surrounding his

disability claim, including requesting another consultative examination.

This is acutely problematic here because Plaintiff's counsel did not renew

his request for another examination at the hearing.  *See generally* <u>Mosley</u>

<u>v. Acting Comm'r of Soc. Sec. Admin.</u>, No. 15-10850, 2015 U.S. App.

LEXIS 21193, at *8-10 and n.1 (11th Cir. Dec. 8, 2015) (unpublished).

Further, Plaintiff has not established clear prejudice to necessitate a

remand.  <u>Mosley v. Acting Comm'r of Soc. Sec. Admin.</u>, 2015 U.S. App.

LEXIS, at *10 (citing <u>Brown v. Shalala</u>, 44 F.3d at 935).

## VI. Conclusion

Considering the record as a whole, the findings of the ALJ are based

upon substantial evidence in the record and the ALJ correctly applied the

law.  Accordingly, it is respectfully recommended that the decision of the

Commissioner to deny Plaintiff's application for Social Security benefits be

**AFFIRMED** and judgment entered for Defendant.

**IN CHAMBERS** at Tallahassee, Florida, on February 11, 2016.

s/ Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**